ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
Email: andrew@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
DAVID WILLIAMS (State Bar No. 144479)
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
Tel. (707) 630-5061
Email: wverick@igc.org

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,<br><br>Plaintiff,<br><br>vs.<br><br>KERNEN CONSTRUCTION CO., BEDROCK INVESTMENTS LLC, SCOTT FARLEY, and KURT KERNEN,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

CALIFORNIANS FOR ALTERNATIVES TO TOXICS ("CATs"), by and through its counsel, hereby alleges:

## I.  JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against Kernen Construction Co., Bedrock Investments LLC, Scott

Farley, and Kurt Kernen ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2. On or about May 13, 2016, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of CATs' CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3. More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise

to Plaintiff's claims occurred in this District.  Intra-district venue is proper in San Francisco, California, because the sources of the violations are located within Humboldt County, California.

**II.     INTRODUCTION**

5.      This Complaint seeks relief for Defendants' violations of the CWA at the approximately 37-acre facility owned and/or operated by Defendants (the "Facility").  The Facility is located at 2350 Glendale Drive, in McKinleyville, California.  Defendants discharge pollutant-contaminated storm water from the Facility into Hall Creek which drains into Mad River.  Defendants are violating both the substantive and procedural requirements of the CWA.

6.      Defendants' discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7.      The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as Hall Creek and Mad River.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.

**III.    PARTIES**

8.      CATs is a non-profit public benefit corporation organized under the laws of California, based in Arcata, California.  CATs is dedicated to the defense of the environment

Complaint For Declaratory and                                                    Case No.
Injunctive Relief and Civil Penalties

3

from the effects of toxic chemicals, and the preservation and protection of the wildlife and natural resources of California waters, including the waters into which Defendants discharge polluted storm water.  To further its goals, CATs actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

9.     Members of CATs, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near Hall Creek and Mad River, into which Defendants cause pollutants to be discharged.  These CATs members use and enjoy the impacted waters for cultural, recreational, educational, scientific, conservation, aesthetic and spiritual purposes.  Defendants' discharge of storm water containing pollutants impairs each of those uses.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

10.     Members of CATs reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CATs use and enjoy the waters of Hall Creek and Mad River, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CATs use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

11.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

12.     Plaintiff is informed and believes, and thereupon alleges that Defendants own and/or operate the Facility.

Complaint For Declaratory and                                                    Case No.
Injunctive Relief and Civil Penalties

4

## IV.      LEGAL BACKGROUND

### A.      Clean Water Act

13.      Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

14.      Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.      The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

16.      A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

17.      "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).

18.      Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial

activity.  *Id.* § 1342(p)(2)(B).

19.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

20.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     State Regulations**

21.     Mad River is degraded from pollutant loading.  This is officially recognized by the EPA, the State Board and the Regional Board, which have place the river on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards.  The Regional Board's Water Quality Control Plan for the North Coast Basin (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as lead, copper, zinc and aluminum.

22.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic

Complaint For Declaratory and                                                           Case No.
Injunctive Relief and Civil Penalties

6

priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.  The CTR applies to Hall Creek and Mad River, and includes limits for several toxic metals, including lead, copper and zinc.

### C.     California's General Industrial Storm Water Permit

23.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

24.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

25.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

26.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI"). The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

27.     Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

28.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

29.     The General Permit contains three primary and interrelated categories of

Complaint For Declaratory and                                                      Case No.
Injunctive Relief and Civil Penalties

requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

30.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code. Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

31.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

32.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Oil & Grease – 15 mg/L; Zinc – 0.117 mg/L; Chemical Oxygen Demand – 120 mg/L; Iron – 1.00 mg/L; Copper – 0.0048 mg/L; and, Aluminum – 0.75 mg/L.

33.     The Regional Board has established water quality standards for Mad River in the Basin Plan.

34.     The Basin Plan includes a toxicity standard which states that "[a]ll waters

shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life." III-8.01, Basin Plan.

35.     The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife." III-3.00 Basin Plan.

36.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)." *Id.*

37.     EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic pollutants in California surface waters. 40 C.F.R. § 131.38 (2013). The CTR establishes the following applicable numeric limit for freshwater surface waters: zinc – 0.12 mg/L (maximum concentration), subject to water hardness.

38.     The General Permit requires dischargers to develop and implement a site-specific SWPPP. General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

39.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions. General Permit, Section X.B.

40.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit. In addition to the minimum BMPs identified in Section

X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice. General Permit, Section X.H.2.

41.     Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

42.     Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

43.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

44.     The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water

1    discharged from the facility base on the pollutant source assessment.  General Permit,

2    Section XI.B.6.

3         45.      Dischargers must submit all sampling and analytical results via SMARTS

4    within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.

5    Sampling results must be compared to the two types of Numeric Action Level ("NAL")

6    values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual

7    NAL exceedance occurs when the average of the results for a parameter for all samples

8    taken within a reporting year exceeds the annual NAL value.  General Permit, Section

9    XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from

10   samples taken for any single parameter within a reporting year exceed the instantaneous

11   maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL

12   exceedance during a reporting year, the discharger's status changes to Level 1 status under

13   the General Permit and the discharger must comply with the requirements set forth for Level

14   1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2

15   status if sampling results indicated an NAL exceedance for a parameter while the discharger

16   is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the

17   obligations set forth at Section XII.D of the General Permit.

18        46.      Dischargers must submit an Annual Report no later than July 15th following

19   each reporting year certifying compliance with the Permit and/or an explanation for any non-

20   compliance.  General Permit, Section XVI.

21   **V.    STATEMENT OF FACTS**

22        47.      The Facility is classified as conforming to Standard Industrial Classification

23   ("SIC") Codes 5093 ("Scrap and Waste Materials") and 142X, which includes SIC Codes

24   1422, 1423, and 1429 ("Crushed and Broken Limestone, Granite, and Stone").  Industrial

25   activities occur throughout the Facility.  CATs' investigation into the industrial activities at

26   Defendant's approximately 37-acre facility indicates that the Facility is used to manufacture

27   and store rock aggregate products.  Moreover, the Facility is used, or has been used in the

28   past, for storing of scrap roofing shingles, storing scrap metal, and storage for soil and

1  organic debris.

2     48.      Most of these activities occur outside in areas that are exposed to storm

3  water and storm flows due to the lack of overhead coverage, functional berms and other

4  storm water controls.  Plaintiff is informed and believes that Defendants' storm water

5  controls, to the extent any exist, fail to achieve BAT and BCT standards.

6     49.    The management practices at the Facility are wholly inadequate to prevent the

7  sources of contamination described above from causing the discharge of pollutants to waters

8  of the United States and fail to meet BAT and BCT standards.  The Facility lacks essential

9  structural controls such as grading, berming and roofing to prevent rainfall and storm water

10  flows from coming into contact with these and other sources of contaminants, thereby

11  allowing storm water to flow over and across these materials and become contaminated prior

12  to leaving the Facility.  In addition, the Facility lacks structural controls to prevent the

13  discharge of water once contaminated.  The Facility also lacks an adequate filtration system

14  to treat water once it is contaminated.

15     50.    During rain events, storm water laden with pollutants discharges from the

16  Facility to storm water conveyances, which ultimately drain to the Sacramento River and the

17  Delta.

18     51.    Information available to Plaintiff indicates that as a result of these practices,

19  storm water containing pollutants harmful to fish, plant and bird life, and human health are

20  being discharged from the Facility directly to these waters during significant rain events.

21     52.    Information available to Plaintiff indicates that Defendants have not fulfilled

22  the requirements set forth in the General Permit for discharges from the Facility due to the

23  continued discharge of contaminated storm water.

24     53.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have

25  failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the

26  Facility.

27     54.    Information available to Plaintiff indicates the continued existence of unlawful

28  storm water discharges at the Facility.

Complaint For Declaratory and                                        Case No.
Injunctive Relief and Civil Penalties

55.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, have not conducted visual monitoring, and have not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

56.     Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water From The Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

57.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

58.     Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

59.     Plaintiff is informed and believes, and thereupon alleges, that since at least January 19, 2012, Defendants have been discharging polluted storm water from the Facility into Hall Creek, which ultimately drains to Mad River in violation of the General Permit.

60.     During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into Hall Creek, which ultimately drains to Mad River.

61.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United

Complaint For Declaratory and                                          Case No.
Injunctive Relief and Civil Penalties

13

States in violation of Discharge Prohibition III.C of the General Permit.

62.     Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

63.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit.

64.     Plaintiff is informed and believes, and thereupon alleges, that every day since April 29, 2011, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit. These violations are ongoing and continuous.

65.     Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since January 19, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### SECOND CLAIM FOR RELIEF
**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan For the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

66.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

67.     Section X of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

68.     Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials

without appropriate best management practices; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

69.     Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

70.     Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since April 29, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### THIRD CLAIM FOR RELIEF
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

71.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

72.     The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

73.     Defendants have failed to implement BAT and BCT at the Facility for their discharges of TSS, zinc, aluminum, iron, copper, and COD in violation of Effluent Limitation D.32 of the General Permit.

74.     Each day that Defendants have failed to develop and implement BAT and

Complaint For Declaratory and                                                                Case No.
Injunctive Relief and Civil Penalties

BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

75.     Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

76.     Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least January 19, 2012.  Defendants are subject to civil penalties for each and every violation of the Act since January 19, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### FOURTH CLAIM FOR RELIEF
**Failure to Develop and Implement an Adequate
Monitoring Implementation Plan for the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

77.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

78.     Section X.I and Section XI. of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

79.     Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, including Total Suspended Solids – 100 mg/L, Oil & Grease – 15 mg/L, Lead – 0.262 mg/L, Copper – 0.0048 mg/L, Aluminum – 0.75 mg/L, Zinc – 0.117 mg/L, and Chemical Oxygen Demand – 120 mg/L, as the General Permit requires, and its failure to file required Annual Reports with the Regional Board which provide required documentation and information relating to visual

observations and storm water sampling and analysis conducted at the Facility.

80.     Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in each day since at least January 19, 2012.  These violations are ongoing and continuous.

81.     Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since January 19, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## VII.   <u>RELIEF REQUESTED</u>

Wherefore, CATs respectfully requests that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to pay civil penalties of $37,500 per day per violation for all violations occurring after January 19, 2012, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

e.   Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by their activities;

f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

1          g.   Award any such other and further relief as this Court may deem appropriate.

2

3    Dated: July 15, 2016                    Respectfully Submitted,

4                                           LAW OFFICES OF ANDREW L. PACKARD

5                                  By:      /s/ Andrew L. Packard

6                                           Andrew L. Packard
7                                           Attorneys for Plaintiff
                                            CALIFORNIANS FOR
8                                           ALTERNATIVES TO TOXICS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint For Declaratory and                                              Case No.
Injunctive Relief and Civil Penalties

**EXHIBIT A**

Law Offices Of

# ANDREW L. PACKARD

100 Petaluma Blvd N, Ste 301, Petaluma, CA 94952
Phone (707) 763-7227   Fax (707) 763-9227
Info@PackardLawOffices.com

May 13, 2016

**VIA CERTIFIED MAIL**

Scott Farley, Partner                           Scott Farley, Partner
Kernen Construction Co.                    Kernen Construction Co., Glendale Yard
P.O. Box 1340                                    2350 Glendale Drive
Blue Lake, CA 95525                         McKinleyville, CA 95519

Kurt Kernen, Agent for Service of Process
Bedrock Investments, LLC
2350 Glendale Road
Arcata, CA 95519

Re:    **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE
FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")
(33 U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Farley and Mr. Kernen:

This firm represents Californians for Alternatives to Toxics ("CATs") in regard to
violations of the Clean Water Act ("the Act") occurring at Kernen Construction Company's
("Kernen Construction") Glendale Yard located at 2350 Glendale Drive, in McKinleyville,
California (the "Facility"). This letter is being sent to you as the responsible owners, officers
and/or operators of the Facility. Unless otherwise noted, Kernen Construction Co., Bedrock
Investments, LLC, Mr. Farley and Mr. Kernen shall hereinafter be collectively referred to as
"Kernen Construction." CATs is a non-profit association dedicated to the preservation,
protection and defense of the environment, wildlife and natural resources of California waters,
including the waters into which Kernen Construction discharges polluted storm water.

Kernen Construction is in ongoing violation of the substantive and procedural
requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge
Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control
Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 92-12-DWQ, Order No.
97-03-DWQ, and Order 2014-0057-DWQ ("General Permit" or "Permit").[1]

On July 1, 2015 the 2015 General Permit went into effect, superseding the 1997 General
Permit that was operative between 1997 and June 30, 2015. The 2015 General Permit includes

---

[1] Kernen Construction submitted a Notice of Intent (NOI) to comply with the General Permit for
the Glendale Yard Facility on or about June 8, 2015.

Notice of Violation and Intent To File Suit
May 13, 2016
Page 2 of 13

many of the same fundamental requirements and implements many of the same statutory requirements as the 1997 General Permit.  Violations of both the 1997 and 2015 General Permit provisions are enforceable under the law.  2015 General Permit, Finding A.6.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Kernen Construction to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CATs will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2.  As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility.  40 C.F.R. § 135.3(a).  At the expiration of sixty (60) days from the date of this letter, CATs intends to file suit under Section 505(a) of the Act in federal court against Kernen Construction for violations of the Clean Water Act and the Permit.

I.    **Background.**

A.    **The Clean Water Act.**

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251.  The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1156 (9th Cir. 2002).  The Act is administered largely through the NPDES permit program.  33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system.  Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal. *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states.  *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program).  The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide

Notice of Violation and Intent To File Suit
May 13, 2016
Page 3 of 13

general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).
Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State
Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342

### B.    California's General Permit for Storm Water Discharges Associated with Industrial Activities

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-
DWQ, which CATs refers to as the "1997 General Permit." On July 1, 2015, pursuant to Order
No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental
terms as the prior permit. For purposes of this notice letter, CATs refers to the reissued permit as
the "2015 General Permit." The 2015 General Permit rescinded in whole the 1997 General
Permit, except for the expired permit's requirement that annual reports be submitted by July 1,
2015, and for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Facilities discharging, or having the potential to discharge, storm water associated with
industrial activities that have not obtained an individual NPDES permit must apply for coverage
under the General Permit by filing a Notice of Intent to Comply ("NOI"). 1997 General Permit,
Provision E.1; 2015 General Permit, Standard Condition XXI.A. Facilities must file their NOIs
before the initiation of industrial operations. *Id.*

Facilities must strictly comply with all of the terms and conditions of the General Permit.
A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements:
(1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water
Pollution Prevention Plan ("SWPPP") requirements; and, (3) self-monitoring and reporting
requirements.

### C.    Kernen Construction's Glendale Yard Facility

Kernen Construction's primary industrial activities at the approximately 37-acre Facility
include storing and manufacturing rock aggregate products, storing scrap roofing shingles,
storing scrap metal and storage for soil and organic debris.  The industrial activities at the
Facility fall under Standard Industrial Classification ("SIC") Code 5093 and 142X, which
includes SIC Codes 1422, 1423, and 1429.

Kernen Construction collects and discharges storm water associated with industrial
activities at the Facility through at least four (4) discharge points into Hall Creek, a tributary of
Mad River, which ultimately flows into the Pacific Ocean.  Hall Creek and Mad River are waters
of the United States within the meaning of the Clean Water Act.

The General Permit requires Kernen Construction to analyze storm water samples for
TSS, pH, and Oil and Grease.  1997 General Permit, Section B.5.c.i; 2015 General Permit,
Section XI.B.6.  Facilities under SIC Code 5093 must also analyze storm water samples for Iron
("Fe"); Lead ("Pb"); Aluminum ("Al"); Zinc ("Zn"); and Chemical Oxygen Demand ("COD").
1997 General Permit, Tables 1-2; 2015 General Permit Tables 1-2.

Notice of Violation and Intent To File Suit
May 13, 2016
Page 4 of 13

**II.      Kernen Construction's Violations of the Act and Permit.**

Based on its review of available public documents, CATs is informed and believes that Kernen Construction is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit.  These violations are ongoing and continuous.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Kernen Construction is subject to penalties for violations of the Act since May 13, 2011.

**A.      Kernen Construction Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.**

Kernen Construction's storm water sampling results provide conclusive evidence of Kernen Construction's failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

**1.      Applicable Water Quality Standards.**

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. 1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. 1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. 1997 General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. 1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  *Id.*

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, violation of which is a violation of Permit conditions.  *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.,* 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015).  CTR establishes

Notice of Violation and Intent To File Suit
May 13, 2016
Page 5 of 13

numeric receiving water limits for toxic pollutants in California surface waters.  40 C.F.R. § 131.38.  The CTR establishes the following numeric limits for pollutants discharged by Kernen Construction: Copper – 0.013 mg/L (maximum concentration) and Lead – 0.065 mg/L (maximum concentration).

The *Water Quality Control Plan for the North Coast Region (Revised May 2011)* ("Basin Plan") also sets forth water quality standards and prohibitions applicable to Kernen Construction's storm water discharges. The Basin Plan identifies present and potential beneficial uses for the Mad River, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

## 2.    Applicable Effluent Limitations.

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal 2009); 1997 General Permit, Effluent Limitations B.5-6; 2015 General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by Kernen Construction: Total Suspended Solids – 100 mg/L; Oil & Grease – 15.0 mg/L; Chemical Oxygen Demand – 120 mg/L; Aluminum – 0.75 mg/L; Iron – 1.00 mg/L; Zinc – 0.117 mg/L; and Copper – 0.0636 mg/L.

## 3.    Kernen Construction's Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

### a.    Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value

Notice of Violation and Intent To File Suit
May 13, 2016
Page 6 of 13

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/28/16 | Site #1 | TSS | 650 | 100 |
| 1/28/16 | Site #2 | TSS | 3800 | 100 |
| 1/28/16 | Site #3 | TSS | 480 | 100 |
| 12/18/15 | Site #1 | TSS | 170 | 100 |
| 12/18/15 | Site #2 | TSS | 240 | 100 |
| 12/18/15 | Site #3 | TSS | 140 | 100 |
| 12/3/15 | Site #1 | TSS | 1500 | 100 |
| 12/3/15 | Site #2 | TSS | 1300 | 100 |
| 12/3/15 | Site #3 | TSS | 650 | 100 |
| 2/6/15 | Site#2 | TSS | 300 | 100 |
| 2/6/15 | Site #3 | TSS | 1500 | 100 |
| 12/10/14 | Site #2 | TSS | 290 | 100 |
| 12/10/14 | Site #3 | TSS | 310 | 100 |
| 2/7/14 | Site #2 | TSS | 330 | 100 |
| 2/7/14 | Site #3 | TSS | 670 | 100 |
| 12/20/12 | Site #1 | TSS | 110 | 100 |
| 12/20/12 | Site #2 | TSS | 1100 | 100 |
| 4/26/12 | Site #2 | TSS | 230 | 100 |
| 1/19/12 | Site #2 | TSS | 290 | 100 |
| 1/19/12 | Site #3 | TSS | 600 | 100 |

        **b.**    **Discharge of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark and CTR Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) | CTR Criteria (mg/L) |
|---|---|---|---|---|---|
| 1/14/16 | Site #1 | Zn | 0.270 | 0.117 | 0.12 |
| 1/14/16 | Site #2 | Zn | 0.370 | 0.117 | 0.12 |
| 12/18/15 | Site 1 | Zn | 0.120 | 0.117 | 0.12 |
| 12/3/15 | Site #1 | Zn | 0.550 | 0.117 | 0.12 |
| 12/3/15 | Site #2 | Zn | 0.320 | 0.117 | 0.12 |
| 12/3/15 | Site #3 | Zn | 0.140 | 0.117 | 0.12 |
| 2/6/15 | Site#2 | Zn | 0.160 | 0.117 | 0.12 |
| 2/6/15 | Site #3 | Zn | 0.270 | 0.117 | 0.12 |
| 12/10/14 | Site #2 | Zn | 0.120 | 0.117 | 0.12 |
| 2/7/14 | Site #2 | Zn | 0.210 | 0.117 | 0.12 |
| 2/7/14 | Site #3 | Zn | 0.130 | 0.117 | 0.12 |
| 12/20/12 | Site #2 | Zn | 0.373 | 0.117 | 0.12 |

Notice of Violation and Intent To File Suit
May 13, 2016
Page 7 of 13

| 4/26/12 | Site #2 | Zn | 0.130 | 0.117 | 0.12 |
| 1/19/12 | Site #2 | Zn | 0.140 | 0.117 | 0.12 |

       **c.**    **Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/14/16 | Site #1 | COD | 190 | 120 |
| 1/14/16 | Site #2 | COD | 330 | 120 |
| 12/3/15 | Site #1 | COD | 590 | 120 |
| 12/3/15 | Site #2 | COD | 440 | 120 |

       **d.**    **Discharge of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/14/16 | Site #1 | Al | 24 | 0.75 |
| 1/14/16 | Site #2 | Al | 120 | 0.75 |
| 1/14/16 | Site #3 | Al | 23 | 0.75 |
| 12/18/15 | Site 1 | Al | 12 | 0.75 |
| 12/18/15 | Site 2 | Al | 30 | 0.75 |
| 12/18/15 | Site 3 | Al | 24 | 0.75 |
| 12/3/15 | Site #1 | Al | 74 | 0.75 |
| 12/3/15 | Site #2 | Al | 61 | 0.75 |
| 12/3/15 | Site #3 | Al | 34 | 0.75 |
| 2/6/15 | Site #1 | Al | 8.2 | 0.75 |
| 2/6/15 | Site#2 | Al | 15 | 0.75 |
| 2/6/15 | Site #3 | Al | 69 | 0.75 |
| 12/10/14 | Site #1 | Al | 4.9 | 0.75 |
| 12/10/14 | Site #2 | Al | 13 | 0.75 |
| 12/10/14 | Site #3 | Al | 18 | 0.75 |
| 12/10/14 | Site #4 | Al | 0.940 | 0.75 |
| 2/7/14 | Site #1 | Al | 4.5 | 0.75 |
| 2/7/14 | Site #2 | Al | 18 | 0.75 |
| 2/7/14 | Site #3 | Al | 25 | 0.75 |
| 12/20/12 | Site #1 | Al | 3.31 | 0.75 |
| 12/20/12 | Site #2 | Al | 23.1 | 0.75 |
| 4/26/12 | Site #1 | Al | 1.9 | 0.75 |
| 4/26/12 | Site #2 | Al | 9.8 | 0.75 |

Notice of Violation and Intent To File Suit
May 13, 2016
Page 8 of 13

| 1/19/12 | Site #1 | Al | 5.3 | 0.75 |
| 1/19/12 | Site #2 | Al | 12 | 0.75 |
| 1/19/12 | Site #3 | Al | 20 | 0.75 |

**e.    Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|
| 1/14/16 | Site #1 | Fe | 39 | 1.0 |
| 1/14/16 | Site #2 | Fe | 230 | 1.0 |
| 1/14/16 | Site #3 | Fe | 24 | 1.0 |
| 12/18/15 | Site 1 | Fe | 15 | 1.0 |
| 12/18/15 | Site 2 | Fe | 48 | 1.0 |
| 12/18/15 | Site 3 | Fe | 23 | 1.0 |
| 12/3/15 | Site #1 | Fe | 110 | 1.0 |
| 12/3/15 | Site #2 | Fe | 94 | 1.0 |
| 12/3/15 | Site #3 | Fe | 52 | 1.0 |
| 2/6/15 | Site #1 | Fe | 7.4 | 1.0 |
| 2/6/15 | Site#2 | Fe | 22 | 1.0 |
| 2/6/15 | Site #3 | Fe | 110 | 1.0 |
| 12/10/14 | Site #1 | Fe | 6.1 | 1.0 |
| 12/10/14 | Site #2 | Fe | 20 | 1.0 |
| 12/10/14 | Site #3 | Fe | 31 | 1.0 |
| 12/10/14 | Site #4 | Fe | 1.3 | 1.0 |
| 2/7/14 | Site #1 | Fe | 4.4 | 1.0 |
| 2/7/14 | Site #2 | Fe | 27 | 1.0 |
| 2/7/14 | Site #3 | Fe | 37 | 1.0 |
| 12/20/12 | Site #1 | Fe | 4.7 | 1.0 |
| 12/20/12 | Site #2 | Fe | 34.2 | 1.0 |
| 12/20/12 | Site #4 | Fe | 1.07 | 1.0 |
| 4/26/12 | Site #1 | Fe | 2.3 | 1.0 |
| 4/26/12 | Site #2 | Fe | 13 | 1.0 |
| 1/19/12 | Site #1 | Fe | 6.5 | 1.0 |
| 1/19/12 | Site #2 | Fe | 17 | 1.0 |
| 1/19/12 | Site #3 | Fe | 28 | 1.0 |

**f.    Discharge of Storm Water Containing Copper (Cu) at Concentrations in Excess of Applicable EPA Benchmark and CTR Values**

Notice of Violation and Intent To File Suit
May 13, 2016
Page 9 of 13

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) | CTR Criteria (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|---------------------|
| 2/6/15 | Site #2 | Cu | 0.029 | 0.0636 | 0.013 |
| 2/6/15 | Site #3 | Cu | 0.094 | 0.0636 | 0.013 |
| 12/10/14 | Site #2 | Cu | 0.028 | 0.0636 | 0.013 |
| 12/10/14 | Site #3 | Cu | 0.034 | 0.0636 | 0.013 |
| 12/10/14 | Site #4 | Cu | 0.014 | 0.0636 | 0.013 |
| 2/7/14 | Site #2 | Cu | 0.043 | 0.0636 | 0.013 |
| 2/7/14 | Site #3 | Cu | 0.046 | 0.0636 | 0.013 |
| 12/20/12 | Site #2 | Cu | 0.0614 | 0.0636 | 0.013 |
| 4/26/12 | Site #2 | Cu | 0.020 | 0.0636 | 0.013 |
| 1/19/12 | Site #2 | Cu | 0.024 | 0.0636 | 0.013 |
| 1/19/12 | Site #3 | Cu | 0.051 | 0.0636 | 0.013 |

g.    **Discharges of Storm Water Exceeding the Basin Plan Standards for pH**

| Date | Discharge Point | Parameter | Concentration in Discharge (pH units) | Basin Plan (pH units) |
|------|-----------------|-----------|----------------------------------------|-----------------------|
| 2/6/15 | Site #3 | pH | 8.76 | 6.5 – 8.5 |
| 4/26/12 | Site #1 | pH | 6.2 | 6.5 – 8.5 |
| 1/19/12 | Site #2 | pH | 8.7 | 6.5 – 8.5 |
| 1/19/12 | Site #3 | pH | 9.9 | 6.5 – 8.5 |

h.    **Kernen Construction's Sample Results Are Evidence of Violations of the General Permit**

Kernen Construction's sample results demonstrate violations of the Permit's discharge prohibitions, receiving water limitations and effluent limitations set forth above. CATs is informed and believes that Kernen Construction has known that its storm water contains pollutants at levels exceeding General Permit standards since at least May 13, 2011.

CATs alleges that such violations occur each time storm water discharges from the Facility. Attachment A hereto, sets forth the specific rain dates on which CATs alleges that Kernen Construction has discharged storm water containing impermissible levels of TSS, COD, Al, Fe, Zn, Cu, and pH in violation of the General Permit. 1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

4.    **Kernen Construction Has Failed to Implement BAT and BCT**

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water

Notice of Violation and Intent To File Suit
May 13, 2016
Page 10 of 13

discharges. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* 1997 General Permit, Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

Kernen Construction has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping.  Permit, Section X.H.1(a-g).

Kernen Construction has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including:  exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. 1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day that Kernen Construction  have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Kernen Construction have been in violation of the BAT and BCT requirements at the Facility every day since at least May 13, 2011.

### 5.      Kernen Construction Has Failed to Implement an Adequate Monitoring Implementation Plan.

The General Permit requires dischargers to implement a Monitoring Implementation Plan.  Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment.  Permit, Section XI.B.6.   Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event. Section XI.B.11.

Notice of Violation and Intent To File Suit
May 13, 2016
Page 11 of 13

Kernen Construction has failed to develop and implement an adequate Monitoring Implementation Plan.  These failures include using incorrect test methods to analyze samples and failing to analyze each sample for all required parameters.

Each day that Kernen Construction has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit. Kernen Construction has been in violation of the Monitoring Implementation Plan requirements every day since at least May 13, 2011.

### 6.    Kernen Construction Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

The General Permit requires dischargers to develop and implement a site-specific SWPPP. 1997 General Permit, Section A.1; 2015 General Permit, Section X.A.  The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. 2015 General Permit, Section X.B; see also 1997 General permit, Section A.

CATs's investigation indicates that Kernen Construction has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements. Kernen Construction has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous effluent limitation violations.

Each day Kernen Construction failed to develop and implement an adequate SWPPP is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit. Kernen Construction has been in violation of these requirements at the Facility every day since at least May 13, 2011.

### III.    Persons Responsible for the Violations.

CATs puts Kernen Construction on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CATs puts Kernen Construction on formal notice that it intends to include those persons in this action.

Notice of Violation and Intent To File Suit
May 13, 2016
Page 12 of 13


**IV.      Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows:
Patricia Clary, Executive Director
Californians for Alternatives to Toxics
P.O. Box 900
Eureka, CA 95502
(707) 834-4833


**V.       Counsel.**

CATs has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard                                 David Williams
Megan E. Truxillo                                  Klamath Environmental Law Center
William N. Carlon                                  1990 N. California Blvd., 8 Floor th
Law Offices Of Andrew L. Packard             Walnut Creek, CA 94596
100 Petaluma Boulevard North, Suite 301      (510) 847-2356
Petaluma, CA 94952                               davidhwilliams@earthlink.net
(707) 763-7227
Andrew@PackardLawOffices.com

William Verick
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
(707) 630-5061
wverick@igc.org


**VI.      Conclusion**

CATs believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against Kernen Construction Company and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Notice of Violation and Intent To File Suit
May 13, 2016
Page 13 of 13

Sincerely,

_____
Andrew L. Packard
Law Offices of Andrew L. Packard
Counsel for Californians for Alternatives to Toxics

Notice of Violation and Intent To File Suit
May 13, 2016
Page 14 of 13

## **SERVICE LIST**

### **VIA CERTIFIED MAIL**

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Jared Blumenfield, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

Hon. Loretta Lynch
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Matthias St. John, Executive Officer
North Coast Regional Water Quality Control Board
5550 Skylane Boulevard Suite A
Santa Rosa, CA 95403

**ATTACHMENT A**
**Notice of Intent to File Suit, Kernen Construction**
**Significant Rain Events,* 5/13/2011 – 5/13/2016**

| | | | |
|---|---|---|---|
| May 15, 2011 | January 19, 2012 | April 10, 2012 | December 4, 2012 |
| May 16, 2011 | January 20, 2012 | April 11, 2012 | December 5, 2012 |
| May 17, 2011 | January 21, 2012 | April 12, 2012 | December 12, 2012 |
| May 18, 2011 | January 22, 2012 | April 13, 2012 | December 16, 2012 |
| May 25, 2011 | January 23, 2012 | April 14, 2012 | December 17, 2012 |
| May 26, 2011 | January 25, 2012 | April 17, 2012 | December 18, 2012 |
| May 27, 2011 | January 26, 2012 | April 18, 2012 | December 19, 2012 |
| May 28, 2011 | January 30, 2012 | April 19, 2012 | December 20, 2012 |
| May 29, 2011 | February 1, 2012 | April 20, 2012 | December 21, 2012 |
| May 31, 2011 | February 8, 2012 | April 26, 2012 | December 22, 2012 |
| June 1, 2011 | February 10, 2012 | April 27, 2012 | December 23, 2012 |
| June 2, 2011 | February 11, 2012 | May 3, 2012 | December 24, 2012 |
| June 6, 2011 | February 13, 2012 | May 4, 2012 | December 25, 2012 |
| June 28, 2011 | February 18, 2012 | May 22, 2012 | December 26, 2012 |
| June 29, 2011 | February 25, 2012 | May 25, 2012 | December 27, 2012 |
| July 19, 2011 | February 29, 2012 | June 3, 2012 | December 29, 2012 |
| September 25, 2011 | March 1, 2012 | June 4, 2012 | January 10, 2013 |
| October 3, 2011 | March 2, 2012 | June 5, 2012 | January 11, 2013 |
| October 4, 2011 | March 6, 2012 | June 23, 2012 | January 24, 2013 |
| October 5, 2011 | March 11, 2012 | June 26, 2012 | January 26, 2013 |
| October 6, 2011 | March 12, 2012 | July 1, 2012 | January 27, 2013 |
| October 10, 2011 | March 13, 2012 | July 17, 2012 | January 28, 2013 |
| October 11, 2011 | March 15, 2012 | July 18, 2012 | February 6, 2013 |
| October 12, 2011 | March 16, 2012 | July 20, 2012 | February 7, 2013 |
| November 3, 2011 | March 17, 2012 | October 12, 2012 | February 8, 2013 |
| November 4, 2011 | March 18, 2012 | October 13, 2012 | February 19, 2013 |
| November 6, 2011 | March 19, 2012 | October 16, 2012 | February 20, 2013 |
| November 7, 2011 | March 20, 2012 | October 20, 2012 | February 23, 2013 |
| November 17, 2011 | March 21, 2012 | October 22, 2012 | February 28, 2013 |
| November 18, 2011 | March 22, 2012 | October 23, 2012 | March 1, 2013 |
| November 19, 2011 | March 24, 2012 | October 24, 2012 | March 6, 2013 |
| November 20, 2011 | March 25, 2012 | November 1, 2012 | March 7, 2013 |
| November 23, 2011 | March 27, 2012 | November 3, 2012 | March 20, 2013 |
| November 24, 2011 | March 28, 2012 | November 9, 2012 | March 21, 2013 |
| November 25, 2011 | March 29, 2012 | November 10, 2012 | March 27, 2013 |
| December 15, 2011 | March 30, 2012 | November 20, 2012 | March 31, 2013 |
| December 26, 2011 | March 31, 2012 | November 21, 2012 | April 1, 2013 |
| December 28, 2011 | April 1, 2012 | November 28, 2012 | April 4, 2013 |
| December 29, 2011 | April 2, 2012 | November 29, 2012 | April 5, 2013 |
| December 30, 2011 | April 4, 2012 | November 30, 2012 | April 6, 2013 |
| December 31, 2011 | April 5, 2012 | December 1, 2012 | April 7, 2013 |
| January 5, 2012 | April 9, 2012 | December 2, 2012 | April 8, 2013 |
| May 7, 2013 | February 18, 2014 | October 21, 2014 | March 21, 2015 |
| May 16, 2013 | February 19, 2014 | October 23, 2014 | March 22, 2015 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Kernen Construction**
**Significant Rain Events,\* 5/13/2011 – 5/13/2016**

| | | | |
|---|---|---|---|
| May 17, 2013 | February 27, 2014 | October 24, 2014 | March 28, 2015 |
| May 22, 2013 | February 28, 2014 | October 25, 2014 | March 31, 2015 |
| May 26, 2013 | March 1, 2014 | October 26, 2014 | April 6, 2015 |
| May 27, 2013 | March 2, 2014 | October 31, 2014 | April 7, 2015 |
| May 28, 2013 | March 3, 2014 | November 7, 2014 | April 14, 2015 |
| May 29, 2013 | March 4, 2014 | November 13, 2014 | June 2, 2015 |
| May 30, 2013 | March 5, 2014 | November 15, 2014 | July 9, 2015 |
| June 19, 2013 | March 6, 2014 | November 20, 2014 | July 10, 2015 |
| June 24, 2013 | March 9, 2014 | November 21, 2014 | August 29, 2015 |
| June 26, 2013 | March 10, 2014 | November 22, 2014 | September 17, 2015 |
| September 17, 2013 | March 17, 2014 | November 29, 2014 | September 18, 2015 |
| September 18, 2013 | March 25, 2014 | December 1, 2014 | October 17, 2015 |
| September 21, 2013 | March 26, 2014 | December 3, 2014 | October 26, 2015 |
| September 22, 2013 | March 27, 2014 | December 4, 2014 | October 28, 2015 |
| September 23, 2013 | March 28, 2014 | December 6, 2014 | November 1, 2015 |
| September 25, 2013 | March 29, 2014 | December 8, 2014 | November 2, 2015 |
| September 29, 2013 | March 31, 2014 | December 11, 2014 | November 8, 2015 |
| September 30, 2013 | April 1, 2014 | December 12, 2014 | November 9, 2015 |
| November 3, 2013 | April 20, 2014 | December 13, 2014 | November 10, 2015 |
| November 8, 2013 | April 22, 2014 | December 16, 2014 | November 15, 2015 |
| November 12, 2013 | April 23, 2014 | December 17, 2014 | November 16, 2015 |
| November 13, 2013 | April 24, 2014 | December 18, 2014 | November 17, 2015 |
| November 19, 2013 | April 25, 2014 | December 19, 2014 | November 18, 2015 |
| November 20, 2013 | April 27, 2014 | December 20, 2014 | November 20, 2015 |
| December 3, 2013 | May 5, 2014 | December 21, 2014 | November 24, 2015 |
| December 7, 2013 | May 9, 2014 | December 22, 2014 | November 25, 2015 |
| January 8, 2014 | May 10, 2014 | December 25, 2014 | December 2, 2015 |
| January 9, 2014 | May 18, 2014 | December 30, 2014 | December 3, 2015 |
| January 10, 2014 | May 19, 2014 | January 16, 2015 | December 4, 2015 |
| January 11, 2014 | May 20, 2014 | January 18, 2015 | December 6, 2015 |
| January 12, 2014 | June 25, 2014 | February 2, 2015 | December 9, 2015 |
| January 29, 2014 | June 26, 2014 | February 3, 2015 | December 10, 2015 |
| January 30, 2014 | June 27, 2014 | February 5, 2015 | December 11, 2015 |
| February 7, 2014 | June 28, 2014 | February 6, 2015 | December 12, 2015 |
| February 8, 2014 | September 18, 2014 | February 7, 2015 | December 13, 2015 |
| February 9, 2014 | September 24, 2014 | February 9, 2015 | December 14, 2015 |
| February 10, 2014 | September 25, 2014 | February 10, 2015 | December 17, 2015 |
| February 13, 2014 | September 26, 2014 | February 27, 2015 | December 18, 2015 |
| February 14, 2014 | October 15, 2014 | February 28, 2015 | December 22, 2015 |
| February 15, 2014 | October 18, 2014 | March 12, 2015 | December 23, 2015 |
| February 16, 2014 | October 20, 2014 | March 16, 2015 | December 24, 2015 |
| December 19, 2015 | March 10, 2016 | March 23, 2015 | December 25, 2015 |
| December 20, 2015 | March 12, 2016 | March 24, 2015 | December 28, 2015 |
| December 21, 2015 | March 13, 2016 | March 25, 2015 | December 30, 2015 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Kernen Construction**
**Significant Rain Events,* 5/13/2011 – 5/13/2016**

| | |
|---|---|
| January 5, 2016 | March 27, 2016 |
| January 6, 2016 | April 4, 2016 |
| January 8, 2016 | April 9, 2016 |
| January 9, 2016 | April 14, 2016 |
| January 10, 2016 | April 15, 2016 |
| January 12, 2016 | April 22, 2016 |
| January 13, 2016 | April 23, 2016 |
| January 14, 2016 | April 24, 2016 |
| January 15, 2016 | April 27, 2016 |
| January 16, 2016 | April 28, 2016 |
| January 17, 2016 | |
| January 18, 2016 | |
| January 19, 2016 | |
| January 20, 2016 | |
| January 22, 2016 | |
| January 23, 2016 | |
| January 24, 2016 | |
| January 25, 2016 | |
| January 29, 2016 | |
| January 30, 2016 | |
| February 4, 2016 | |
| February 13, 2016 | |
| February 18, 2016 | |
| February 19, 2016 | |
| February 20, 2016 | |
| February 22, 2016 | |
| February 27, 2016 | |
| February 29, 2016 | |
| March 2, 2016 | |
| March 3, 2016 | |
| March 5, 2016 | |
| March 6, 2016 | |
| March 7, 2016 | |
| March 9, 2016 | |
| March 14, 2016 | |
| March 15, 2016 | |
| March 20, 2016 | |
| March 21, 2016 | |
| March 22, 2016 | |
| March 23, 2016 | |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.