# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

**CALIFORNIANS FOR ALTERNATIVES TO TOXICS,**

       Plaintiff**,**

      v.

**KERNEN CONSTRUCTION CO., ET AL.,**

       Defendants**.**

CASE NO. 16-cv-04007-YGR

**ORDER GRANTING PLAINTIFF'S MOTION TO APPROVE PROPOSITION 65 SETTLEMENT [CALIFORNIA HEALTH & SAFETY CODE SECTION 25249.7(F)(4)]**

Re: Dkt. No. 113

Plaintiff Californians for Alternatives to Toxics filed its Motion to Approve Proposition 65 Settlement on September 11, 2017. (Dkt. No. 113.) The matter came on for hearing on November 7, 2017. Plaintiff appeared by and through its counsel, Andrew L. Packard and David Williams. Defendants appeared by and through their counsel, Allison Jackson.

Having carefully considered the papers submitted on this motion, including the supplemental memorandum of points and authorities in support of the motion (Dkt. No. 123), and the hearing held on November 7, 2017, the Court **GRANTS** plaintiff's motion. Specifically, the Court makes the following findings as to the proposed Consent Agreement ("Consent Agreement"), attached hereto as Exhibit 1, pursuant to California Health & Safety Code Section 25249.7(f)(4):

    (a) The warning requirement of Chapter 6.6 of the Health & Safety Code does not apply to the instant settlement;

    (b) The award of attorney's fees is reasonable under California law; and,

    (c) The penalty amount is reasonable based on the criteria set forth in California Health & Safety Code Section 25249.7(b)(2).

The corrected paragraph in plaintiff's supplemental memorandum of points and authorities in support of the motion (Dkt. No. 123) shall be deemed to replace the corresponding paragraph in

plaintiff's original memorandum. (Dkt. No. 114.)

Pursuant to the parties' Consent Agreement, the Court **DISMISSES WITH PREJUDICE** plaintiff's Clean Water Act claims and retains jurisdiction over the enforcement of the Consent Agreement as provided therein.

The Clerk of the Court shall close the file.

This order terminates Docket No. 113.

**IT IS SO ORDERED.**

Dated: November 13, 2017

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

EXHIBIT 1

ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com
        wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1126 16th Street, Suite 204
Arcata, CA 95521
Tel: (707) 630-5061
Fax: (707) 630-5064
Email: wverick@igc.org

DAVID WILLIAMS (State Bar No. 144479)
Law Offices of David Williams
1990 N. California Blvd., 8th Floor
Walnut Creek, CA 94596
Tel: (510) 847 2356
Fax: (925) 332-0352
E-mail: dhwill7@gmail.com

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

ALLISON G. JACKSON (State Bar No. 157078)
Harland Law Firm LLP
622 H Street
Eureka, CA 95501-1026
Tel: (707) 444-9281
Fax: (707) 445-2961
Email: ajackson@harlandlaw.com

Attorneys for Defendants
KERNEN CONST. CO.; BEDROCK INVESTMENTS LLC;
SCOTT FARLEY; and KURT KERNEN

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation, | Case No. 4:16-CV-04007-YGR |
|---|---|
| Plaintiff, | **CONSENT AGREEMENT** |
| vs. | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)** |
| KERNEN CONSTRUCTION CO., BEDROCK INVESTMENTS, LLC, KURT | |

KERNEN, and SCOTT FARLEY,

Defendants.

**WHEREAS**, Plaintiff Californians for Alternatives to Toxics (hereinafter "CATs") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Defendants Kernen Construction Co., Bedrock Investments, LLC, Kurt Kernen, and Scott Farley (hereinafter "Kernen" or "Defendants") own and/or operate an approximately 37-acre facility at 2350 Glendale Drive in McKinleyville, California which includes storage and manufacturing of rock aggregate products, storing of scrap roofing shingles, storing of scrap metal, and storage of soil and organic debris (collectively, the "Facility") (a map of the Facility is attached hereto as **Exhibit A** and incorporated herein by reference);

**WHEREAS,** CATs and Defendants collectively shall be referred to as the "Parties;"

**WHEREAS**, the Facility collects and discharges storm water from the Facility into Hall Creek, which is a tributary of the Mad River; the Blue Lake hydrologic sub area of the Mad River hydrologic unit is a source of domestic and municipal public drinking water;

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 14-57-DWQ, issued pursuant to Section 402(p) of the Clean Water Act ("Act"), 33 U.S.C. §1342(p), (hereinafter "General Permit") and, prior to July 1, 2015, were regulated by Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order 92-12-DWQ and 97-03-DWQ;

**WHEREAS**, on or about May 13, 2016, Plaintiff provided notice of Defendants' violations of the Act ("Clean Water Act Notice Letter"), and of its intention to file suit against Defendants to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the U.S. Attorney General; the Executive Director of the State Board; the Executive

1    Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"); and to

2    Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CATs'

3    Clean Water Act Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference);

4          **WHEREAS**, on or about June 2, 2016, Plaintiff provided notice of Kernen Construction Co.'s

5    and Bedrock Investments, LLC's alleged violations of California Health & Safety Code § 25249.5 *et*

6    *seq*. (referred to as "Proposition 65") ("Proposition 65 Notice Letter"), and of its intent to file suit to

7    the Proposition 65 Enforcement Reporting section of the office of the California Attorney General

8    ("California Attorney General"); the District Attorney of each California county containing sources of

9    drinking water potentially impacted by such violations of Proposition 65 as described in the

10    Proposition 65 Notice Letter; and, to Kernen Construction Co. and Bedrock Investments, LLC, as

11    required by California Health & Safety Code Section 25249.5, *et seq*. (a true and correct copy of

12    CATs' "Proposition 65 Notice Letter" is attached hereto as **Exhibit C** and incorporated herein by

13    reference);

14          **WHEREAS**, Defendants deny the occurrence of the violations alleged in the Clean Water Act

15    Notice Letter and maintain that Kernen has complied at all times with the provisions of the General

16    Permit and the Clean Water Act or, alternatively, that there are no "ongoing and continuous"

17    violations of the General Permit or the Act;

18          **WHEREAS**, Defendants deny the occurrence of the violations alleged in the Proposition 65

19    Notice Letter and maintain that Kernen has complied at all times with the provisions of Proposition

20    65;

21          **WHEREAS**, the Parties agree that it is in their mutual interest to resolve this matter as to all

22    entities and persons named in the Clean Water Act Notice Letter and the Proposition 65 Notice Letter

23    without litigation and enter into this Consent Agreement ("Agreement")[1];

24

25

26    [1] The Parties ~~have elected to litigate the Proposition 65 claim separately, and have scheduled~~ cross

27 ~~motions for summary judgment to be heard on May 16, 2017.~~ Several of the terms herein are ~~noted~~ as
~~contingent on the outcome of the litigation resolving the Proposition 65 claim.~~

28

CONSENT AGREEMENT                        Case No. 4:16-CV-04007-YGR

**WHEREAS**, on or about July 15, 2016, CATs filed a complaint against Defendants in the United States District Court, Northern District of California (this matter is hereinafter referred to as "the Action");

**WHEREAS**, on or about August 8, 2016, CATs filed a first amended complaint ("First Amended Complaint") incorporating a Proposition 65 claim in the Action upon the expiration of the Proposition 65 Notice Letter;

**WHEREAS**, the parties agree that Defendants entering into this Consent Agreement is not any admission of liability by Defendants regarding the claims made by Plaintiff in the complaint filed July 15, 2016 nor the First Amended Complaint filed August 8, 2016.

**WHEREAS**, for purposes of this Agreement only, the Parties stipulate that venue is proper in this Court, and that Defendants do not contest the exercise of jurisdiction by this Court to dismiss this matter with prejudice under the terms of this Agreement;

**WHEREAS**, within five (5) calendar days of mutual execution, this Agreement shall be submitted to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c);

**WHEREAS,** at the time the Agreement is submitted for approval to the United States District Court, CATs shall notify the Court of the expected date of the expiration of the statutory review period identified above;

**AND WHEREAS**, within ten (10) calendar days of expiration of the statutory review period, , the Parties shall file with the Court a Stipulation and Order that shall provide that the Clean Water Act claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) concurrently with the District Court's retention of jurisdiction for the enforcement of this Agreement as provided herein (the date of entry of the Order to dismiss the Clean Water Act claims shall be referred to herein as the "Court Approval Date").

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AS FOLLOWS:**

**I.**     **COMMITMENTS OF DEFENDANTS**

- 4 -

1.      **Compliance with General Permit and the Clean Water Act.**  Throughout the term of this Agreement, Kernen shall continue implementing all measures needed to operate the Facility in compliance with the requirements of the General Permit, the Clean Water Act and Proposition 65, subject to any defenses available under the law.

2.      **Implementation of Specific Storm Water Best Management Practices.**  Unless otherwise indicated below, on or before **October 1, 2017**, Kernen shall complete the implementation and incorporation into the Facility's Storm Water Pollution Prevention Plan ("SWPPP") of the following storm water source control measures/Best Management Practices ("BMPs") at the Facility:

(a)      *Mandatory Minimum Best Management Practices*.  Kernen shall implement all mandatory minimum BMPs set forth in Section X.H of the General Permit;

(b)      *Containment of Discharges From The Aggregate Processing and Stock Storage Area ("Upper Yard").*  Defendants agree to construct a continuous impermeable berm, comprised of either asphalt/concrete or soil, around the southern and western perimeters of the Upper Yard; see continuous berm identified on the Facility Map attached hereto as **Exhibit A**).  The berm shall be constructed to prevent the discharge of storm water from anywhere along this perimeter, other than at the discharge points shown on **Exhibit A** and designated as discharge points in the Facility SWPPP.

(c)      *Elimination of Discharges from Entry Gate in the Northwest Corner of the Upper Yard.*  Defendants agree to construct a four inch, "speed bump" style berm across the entire entry gate in the Northwest corner of the Upper Yard in order to prevent discharges from occurring at this point.

(d)      *Reconstruction of Discharge Point No.1 & Sampling Location for Sampling Point No. 1.*  Defendants agree to reconstruct this discharge point to collect and discharge all flows from the three large drop inlets on the eastern half of the Upper Yard.  Defendants shall submit to Plaintiff drawings of their plan no later than September 1, 2017.  Plaintiff shall have 45 days to review, comment and either consent or disagree.  In the event Plaintiff disagrees, the parties shall have 14 days to submit letters explaining their positions to the Honorable Joseph Spero.  Chief Magistrate Spero shall render a final binding, non-appealable decision. Monitoring samples for these flows shall be taken at Sampling Point No. 1, as that location is designated on **Exhibit**

A.

       (e)    *Employee Parking Lot Discharges.*  Defendants agree to maintain structural BMPs in the Employee Parking Lot area (identified on the Facility Map attached hereto as **Exhibit A**) such that no storm water associated with industrial activities commingles with exempted storm water flows in, or discharges from, the Employee Parking Lot area.  In the event that CATs can demonstrate that this is occurring, Defendants shall be in material breach of this Agreement and subject to the imposition of an additional mitigation payment to the Rose Foundation in an amount to be determined by the Parties through the dispute resolution procedures set forth herein.

       (f)    *Advanced Filtration at All Discharge Points to Address COD, Al, Fe, Zn and Cu Exceedances.*  Defendants agree to install, at each Facility discharge point on the Upper Yard, a sediment catchment system functionally equivalent[2] to Ultra-Pipe Socks, Ultra-Drain Guards and Filtrexx EnviroSoxx, as appropriate, and to install a metal-absorbing filtration sock functionally equivalent to UltraTech's *Ultra-Filter Sock*, with heavy metal removal media as the last filtration medium prior to discharge[3];

       (g)    *Active Stockpile & Debris Management.*  Defendants agree to install Filtrexx EnviroSoxx to control and manage each Facility stockpile or debris pile (including but not limited to concrete, aggregate, gravel, soil, compost, wood debris, shingles, scrap metal, or any other debris).  (See **Exhibit A** for the location of each such pile, and its associated BMPs as described herein.)  These filtration socks shall be placed on the down gradient half of each such pile such that all storm water flowing from the pile receives filtration through the socks.

------------------------

[2] As used in this Agreement, "functionally equivalent" shall mean that, in the event that Defendants elect to use any alternative products not specified herein, they shall confer with Plaintiff in good faith to obtain Plaintiff's prior written agreement before use.

[3] All storm water management products called for in this Agreement shall be used in accordance with the manufacturer's directions, and cleaned and inspected on a monthly basis during the Wet Season. All such cleaning and inspections shall be logged with the date and the name of the individual undertaking the cleaning or inspections; the logs shall be incorporated into and stored with the SWPPP.

If the metal socks do not work to reduce pollutant concentrations to below the Evaluation Levels set forth in **Exhibit D** during the July 1-December 31, 2017 reporting period (or if Defendants fail to collect all samples required under this Agreement during this reporting period), then Defendants also agree to contain each such Facility stockpile or debris pile within straw wattles (or their functional equivalent) and to access the active piles only from an area uphill to the active pile.  These containment wattles shall be installed on or before January 15, 2018.

(h)	*Inactive Stockpiles and Debris Management.*  Kernen's inactive stockpiles and debris are designated on the Facility Site Map, attached as **Exhibit A**.  Defendants agree to contain all inactive stock piles and debris within a continuous and unbroken set of straw wattles (or the functional equivalent) during the period from September 15th to May 15th.

(i)	*Metal Parts & Equipment Storage.*  Defendants agree to store on pallets or 4 x 4 blocks (or the functional equivalent) all metal parts, equipment, non-debris (which exempts scrap metal pile designated in **Exhibit A**), and any other metal objects capable of being stored on pallets or 4 x 4 blocks such that storm water surface flows do not come into contact with these items.

(j)	*Secondary Containment Around All Oil Drums and Above Ground Storage Tanks ("ASTs").*  Defendants agree to install secondary containment, of sufficient size to contain all spills within the containment structures, based on the volume of the stored materials, for all oil drums and ASTs at the Facility.  Defendants further agree that all oil drums at the Facility shall be placed within areas with adequate secondary containment at all times.  These locations are identified on the Site Map attached hereto as **Exhibit A**.

(k)	*Improved Spill Response/Spill Kits.*  Defendants agree to install six "spill kits" at the Facility, placed throughout the Facility in a manner to best address spills of fuel, lubricant, waste oil or any other fluid spills.  The locations of each these spill kits are identified on the Site Map attached hereto as **Exhibit A**.

(l)	*Elimination of All Unauthorized Non-storm Water Discharges from the*

*Facility.* Defendants agree to eliminate all unauthorized, non-storm water discharges occurring at the Facility, including but not limited to all waters associated with aggregate processing and storage, and all waters associated with truck washing.

(m) *Subsurface Re-Routing of Storm Water Flowing From the Oil/Water Separator at the Truck Wash Station.* Defendants agree to re-route all storm water flowing from the Oil/Water Separator at the Truck Wash Station (which, if discharged, would be an unauthorized non-storm water discharge under the General Permit) to the County sanity sewer so as to eliminate possible non-storm water discharge from Discharge Point No. 3. Defendants shall confirm the City of Arcata's agreement to allow this connection in writing to Plaintiff on or before September 15, 2017; in the event that the City has not agreed to allow the connection by that date, the Parties shall meet and confer in good faith in or before October 1, 2017 to address the elimination of unauthorized non-storm water discharges from the Facility before October 31, 2017. The location of this subsurface conveyance connecting to the sanitary sewer is identified on the Site Map attached hereto as **Exhibit A**.

(n) *Battery Storage.* Defendants agree to store all batteries at the Facility inside at all times.

(o) *Containment of Discharges From The Soil/Gravel Yard and Ground Asphalt Piles ("Lower Yard").* Defendants agree to install Filtrexx EnviroSoxx at the main location where storm water discharges in a southerly direction from the Lower Yard into the East-West Drainage Ditch along the perimeter of the Lower Yard, approximately midway between Noisy Creek and Hall Creek (this location is identified in **Exhibit A)**. Defendants further agree to install Filtrexx EnviroSoxx at each of the existing gravel check dams in the East-West drainage ditch from Noisey Creek to Hall Creek as depicted in Exhibit A. Defendants further agree to prevent all storm water flowing from the Ground Asphalt Piles located near Hall Creek at the Western end of the East-West Drainage from discharging from the Facility.

(p) *Cease Accepting Construction and Demolition Debris.* Defendants shall

no longer accept Construction and Demolition debris, including scrap metal, at the Glendale Yard no later than September 1, 2017.

(q) *Inspection, Maintenance and Repair of Storm Water Conveyance Located Along East-West Road Forming the Southern Perimeter of the Lower Yard.* Defendants agree to inspect this conveyance on a monthly basis during the period from September 15th through May 15th of each year, with all such inspections logged with the date and the name of the individual undertaking the inspections; these logs shall be incorporated into and stored with the SWPPP. Defendants agree to promptly repair any damage to this conveyance, including the adjacent berming, with all such repairs logged with the date and the name of the individual undertaking the repair inspections; these logs shall be incorporated into and stored with the SWPPP.

(r) *Facility Mapping.* On or before October 1, 2017, Defendants agree to revise the Site Map appended to the current SWPPP to comply with all of the requirements in Section X.E.1-3 of the General Permit and for use in documenting this Agreement.

(s) *Increased Employee Training.* Kernen shall increase training for Kernen's Storm Water Pollution Prevention Team ("SWPPT"), including holding one training meeting in January and one training meeting in October of each year. Kernen will incorporate the holding of these twice-annual meetings in its new SWPPP. Kernen shall target training on tracking what storm events qualify for sampling purposes, undertaking visual monitoring, and logging and properly reporting data in the Facility's SWPPP, Annual Report and the State's on-line reporting system ("SMARTS"). Kernen shall log these meetings with the date, materials covered, written agenda, and a list of attendees for each, and shall retain these logs with the SWPPP. Kernen shall have at least one member of the SWPPT, that meets the certification qualifications, be formally certified as a Qualified Industrial Storm Water Practitioner ("QISP");

(t)     *Public Rain Data*.  Unless Kernen installs and maintains a fully automated rain gauge at the Facility, the Parties shall use publicly-available rain data to resolve any disputes under this Consent Agreement.

**3.     SWPPP Amendments.**  On or before October 1, 2017 Defendants shall amend the Facility SWPPP to incorporate all of the relevant requirements of this Agreement and the Revised General Permit.  These revisions shall reflect all then-current site conditions and practices and identify potential Contaminants of Concern ("COC"), identify the location of all pervious and impervious areas, drop inlets, BMPs, and storm water flow vectors.  These revisions shall also provide for required data logging; weekly monitoring and maintenance of all Facility collection and discharge points during the Wet Season; and twice-annual storm water management training for Facility employees.

**4.     Sampling Frequency.**   For the 2017-2018 and 2018-2019 reporting years ending June 30th (2018 and 2019), Defendants shall collect and analyze samples from three (3) Qualifying Storm Events[4] ("QSEs") within the first half of each reporting year (July 1 to December 31), and three (3) QSEs within the second half of each reporting year (January 1 to June 30).  The storm water sample results shall be compared with the values set forth in **Exhibit D**, attached hereto, and incorporated herein by reference.  If the results of any such samples exceed the parameter values set forth in **Exhibit D**, Defendants shall comply with the "Action Memorandum" requirements set forth below.

**5.     Sampling Parameters.**  All six (6) samples in each reporting year shall be analyzed for each of the constituents listed in **Exhibit D**, including TMDLs, as applicable, by a laboratory accredited by the State of California.  All samples collected from the Facility shall be delivered to the

---

[4] A Qualifying Storm Event (QSE) is defined in the Revised General Permit as a precipitation event that: (a) Produces a discharge for at least one drainage area; and (b) is preceded by 48 hours with no discharge from any drainage area.  *See* Revised General Permit, Section XI(b)(1).

laboratory as soon as possible to ensure that sample "hold time" is not exceeded. Analytical methods used by the laboratory shall comply with General Permit requirements in regards to both test method and detection limit. See General Permit, Table 2, at 43. Sampling results shall be provided to CATs within ten (10) days of Defendants' receipt of the laboratory report from each sampling event, pursuant to the Notice provisions below. Defendants agree to analyze all their storm water samples taken during the first reporting period (July 1, 2017-December 31, 2017) for pentachlorophenol ("PCP") and polychlorinated biphenyl ("PCB"); if all three required samples are taken during QSEs and the results are "non-detect" for PCP or for PCB then testing for that specific pollutant can be discontinued for the term of the Agreement.

6. **"Action Memorandum" Trigger; CATs Review Of "Action Memorandum"; Meet-and-Confer.** If any sample taken during the two (2) reporting years referenced in Paragraph 4 above exceeds the Evaluation Levels set forth in **Exhibit D**, or if Defendants fail to collect and analyze samples from six (6) QSEs, then Defendants shall prepare a written statement discussing the exceedance(s) and/or failure to collect and analyze samples from six (6) storm events, the possible cause and/or source of the exceedance(s), and additional measures that will be taken to address and eliminate future exceedances and/or failures to collect required samples ("Action Memorandum").

The Action Memorandum shall be provided to CATs not later than July 15 following the conclusion of each reporting year, on July 15, 2018 and July 15, 2019. Such additional measures may include, but are not limited to, further material improvements to the storm water collection and discharge system, changing the type and frequency of Facility sweeping, changing the type and extent of storm water filtration media or modifying other industrial activities or management practices at the Facility. Such additional measures, to the extent feasible, shall be implemented immediately and in no event later than sixty (60) days after the due date of the Action Memorandum. Within seven (7) days of implementation, the Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Memorandum. CATs may review and comment on an Action Memorandum and suggest any additional pollution prevention measures it believes are appropriate; however, CATs' failure to do so shall not be deemed to constitute agreement with the proposals set forth in the Action

Memorandum.  Upon request by CATs, Defendants agree to meet and confer in good faith (at the Facility, if requested by Plaintiff) regarding the contents and sufficiency of the Action Memorandum.

7.  **Inspections During The Term Of This Agreement.**  In addition to any site inspections conducted as part of the settlement process and the meet-and-confer process concerning an Action Memorandum as set forth above, Defendants shall permit representatives of CATs to perform up to three (3) physical inspections of the Facility during the term of this Agreement.  These inspections shall be performed by CATs' counsel and consultants and may include sampling, photographing, and/or videotaping and CATs shall provide Defendants with a copy of all sampling reports, photographs and/or video.  CATs shall provide at least seventy-two (72) hours advance notice of such physical inspection, except that Defendants shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals.  In such case, Defendants shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by CATs may proceed.  Defendants shall not make any alterations to Facility conditions during the period between receiving CATs' initial seventy-two (72) hour advance notice and the start of CATs' inspection that Defendants would not otherwise have made but for receiving notice of CATs' request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws or regulations.  Nothing herein shall be construed to prevent Defendants from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CATs or at any time.

8.  **Communications To/From Regional and State Water Boards.**  During the term of this Agreement, Kernen shall provide CATs with courtesy copies of all documents submitted to, or received from, the Regional Water Board or the State Water Board concerning storm water discharges from the Facility, including, but not limited to, all documents and reports submitted to the Regional Water Board and/or State Water Board as required by the current General Permit.  Such documents and reports shall be provided to CATs via email pursuant to the Notice provisions set forth below and contemporaneously with Kernen's submission(s) to, or, receipt from, such agencies.

**9.    SWPPP Amendments.**  Pursuant to the Notice provisions set forth below, Defendants shall provide CATs with a copy of any amendments to the Facility SWPPP made during the term of the Agreement within fourteen (14) days of such amendment.

## II.    MITIGATION, CIVIL PENALTIES, COMPLIANCE MONITORING AND FEES AND COSTS

**10.    Mitigation Payment In Lieu Of Civil Penalties Under the Clean Water Act.**  As mitigation to address any potential harms from the Clean Water Act violations alleged in CATs' First Amended Complaint, Defendants agree to pay the sum of $90,000 as follows.  Defendants agree to pay the sum of $70,000 to the Rose Foundation for Communities and the Environment for projects to improve water quality in the Mad River watershed.  Such mitigation payment shall be remitted directly to the Rose Foundation at: Rose Foundation, Attn: Tim Little, 1970 Broadway, Suite 600, Oakland, CA 94612 on March 1, 2018.  Defendants further agree to pay the sum of $20,000 to the Redwood Community Action Agency for use by its Natural Resources Services division for projects to improve water quality in the Mad River watershed.  Such mitigation payment shall be remitted directly to Val Martinez, Redwood Community Action Agency, at 904 G Street, Eureka, CA 95501 on March 1, 2018.

**11.    Stipulated Civil Penalties For Future Violations of Proposition 65.**  Proposition 65 provides for civil penalties of up to $2500 per violation per day, pursuant to California Health & Safety Code § 25249.7.  In the event that Defendants discharge lead from the facility in a concentration greater than 0.5 micrograms/liter, the Parties stipulate that Defendants shall be liable for a stipulated civil penalty in the amount of $100 per discharge measured and found to exceed this concentration level.  Plaintiff shall remit 75% of this amount to the State of California pursuant to Health & Safety Code § 25249.12(c)(1).

**12.    Proposition 65 Civil Penalty; Additional Settlement Payment ("ASP") Under Proposition 65**.  Defendants agree to pay the sum of $25,000 as a civil penalty pursuant to Health & Safety Code § 25249.7(b).  Such payment shall be made to the "Law Offices of Andrew L. Packard

Attorney-Client Trust Account" on March 1, 2018; Plaintiff's counsel shall promptly remit 75% of this amount to the State of California pursuant to Health & Safety Code § 25192.

Defendants further agree to pay the additional sum of $25,000 in lieu of further civil penalties to Val Martinez, Redwood Community Action Agency, at 904 G Street, Eureka, CA 95501 no later than March 1, 2018. These additional funds shall be used to prevent, reduce or eliminate discharges of Proposition 65-listed substances to sources of drinking water, with priority given to the Mad River watershed, and consistent with the statutory goals of Proposition 65.

13. **Compliance Monitoring Funding.** To defray CATs' reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Defendants' compliance with this Agreement, Defendants agree to pay reasonable attorneys fees and costs not to exceed $20,000 over the course of two wet seasons (beginning October 1, 2017 ending April 1, 2019). Plaintiff shall submit periodic invoices reflecting attorneys fees and costs expended. Defendants shall have seven days to either pay or dispute those fees. All payments shall be made to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account". In the event that Defendants dispute the invoice, they shall pay any part of the invoice not disputed within seven days and provide written explanations for the disputed portion of the invoice. Parties shall then meet and confer, in good faith, and if they are unable to resolve the dispute, the Parties shall have fourteen days from the day that the payment was due to submit respective letters to the Honorable Joseph Spero. Judge Spero will issue a final binding non-appealable decision concerning the disputed charges. Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, review of annual reports, discussions with Defendants concerning the Action Memoranda referenced above, and potential changes to compliance requirements herein.

14. **Reimbursement of Fees & Costs.** Defendants agree to reimburse CATs in the amount of $275,000 to defray CATs' reasonable investigative, expert, consultant, and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the action, and negotiating a resolution of this action in the public interest. Such payment shall be

made according to the following schedule: $100,000 shall be paid no later than October 1, 2017; $100,000 shall be paid no later than December 1, 2017; and, $75,000 shall be paid no later than September 1, 2018. All payments shall be made payable to the "Law Offices of Andrew L. Packard Attorney Client Trust Account."

### III. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT

15. With the exception of the timelines set forth above for addressing exceedances of values specified in **Exhibit D** and the Action Memoranda, if a dispute under this Agreement arises, or either Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer within seven (7) days of receiving written notification from the other Party of a request for a meeting to determine whether a breach has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the District Court of California, Northern District, which shall retain jurisdiction over the Action until the Termination Date for the limited purposes of enforcement of the terms of this Agreement. The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the then-applicable federal Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provision.

16. **CATs' Waiver and Release.** Upon the Court Approval Date of this Agreement, CATs, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendants and its officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of its predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims arising from or pertaining to the Notice Letters, including, without limitation, all claims for injunctive relief, damages, penalties, fines,

sanctions, mitigation (excluding all fees of attorneys, experts, and others, and costs per Section II above), or any other sum incurred or claimed or which could have been claimed under the Clean Water Act or Proposition 65 in this Action, for the alleged failure of Defendants to comply with the Clean Water Act or Proposition 65 at the Facility, up to the Court Approval Date.

17. **Defendants' Waiver and Release.** Defendants, on their own behalf and on behalf of any Released Defendant Party under its control, release CATs (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

IV. **MISCELLANEOUS PROVISIONS**

18. The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation of the Clean Water Act claims in the Action. Nothing in this Agreement shall be construed as, and Defendants expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by Defendant of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Agreement.

19. The Agreement shall be effective upon mutual execution by all Parties. The Agreement shall terminate on the "Termination Date," which shall be February 1, 2020.

20. The Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Agreement shall be valid as an original.

21. In the event that any one of the provisions of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

22. The language in all parts of this Agreement, unless otherwise stated, shall be

construed according to its plain and ordinary meaning. This Agreement shall be construed pursuant to the law of the United Sates, without regarding to choice of law principles.

23. The undersigned are authorized to execute this Agreement on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Agreement.

24. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Agreement are contained herein. This Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Agreement, unless otherwise expressly provided for therein.

25. **Notices.** Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to CATs pursuant to this Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Patricia Clary, Executive Director
> Californians for Alternatives to Toxics
> 600 F Street, Suite 3
> Arcata, California 95521
> Tel. (707) 834-4833
> E-mail: patty@alt2tox.org

> With copies sent to:

> Andrew L. Packard
> Law Offices of Andrew L. Packard
> 245 Kentucky Street, Suite B3
> Petaluma, California 94952
> Tel: (707) 782-4060
> E-mail: Andrew@packardlawoffices.com

Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to Defendant pursuant to this Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Kurt Kernen
Kernen Construction Company
Bedrock Investments, LLC
2350 Glendale Drive
McKinleyville, CA 95519
==E-mail:==

Scott Farley
Kernen Construction Company
2350 Glendale Drive
McKinleyville, CA 95519
==E-mail:==

With copies sent to:

Allison G. Jackson
Harland Law Firm LLP
622 H Street
Eureka, California 95501
Tel: (707) 444-9281
E-mail: ajackson@harlandlaw.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

26.     Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

27.     If for any reason the Court should decline to approve this Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Agreement within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Agreement in a mutually acceptable manner, this Agreement shall become null and void.

28.     This Agreement shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

29.     This Agreement and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Agreement, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Agreement. This Agreement may be amended or modified only by a writing signed by the Parties or their authorized representatives.

The Parties hereto enter into this Agreement and respectfully submit it to the Court for its

approval and entry.

Dated: _August 30th_, 2017        Californians for Alternatives to Toxics

By: _____
Patricia Clary, Executive Director

Dated: _8-30_, 2017        Kernen Construction Company

By: _____
Kurt Kernen, Chief Executive Officer
Scott Farley — General Partner

Dated: _8-30_, 2017        Bedrock Investments, LLC

By: _____
[officer] Scott Farley

Dated: _____, 2017        Kurt Kernen

By: _____
Kurt Kernen

Dated: _8-30_, 2017        Scott Farley

By: _____
Scott Farley

Approved as to form:
William Verick
Attorney for Californians for
Alternatives to Toxics

Approved as to form — 8/30/17

- 19 -

approval and entry.

Dated: _____, 2017          Californians for Alternatives to Toxics


By: _____
     Patricia Clary, Executive Director


Dated: ___8/31___, 2017          Kernen Construction Company


By: _____
     Kurt Kernen, Chief Executive Officer


Dated: ___8/31___, 2017          Bedrock Investments, LLC


By: _____
     [officer]

Dated: ___8/31___, 2017          Kurt Kernen


By: _____
     Kurt Kernen

Dated: _____, 2017          Scott Farley


By: _____
     Scott Farley

- 19 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17 **EXHIBIT A – Facility Site Map**
18
19
20
21
22
23
24
25
26
27
28

CONSENT AGREEMENT                                    Case No. 4:16-CV-04007-YGR



EXPLANATION

| | SITE BOUNDARIES |
| | DRAINAGE AREAS |
| | DRAINAGE DIRECTION |
| ✦ | SAMPLE LOCATION / DISCHARGE POINT |
| | BUILDINGS |
| | ROADS |
| | ACTIVE PILES |
| | INACTIVE PILES |
| | CREEKS |
| | PROPOSED BMP |
| | EXISTING BMP |
| ✚ | SPILL KITS |
| ▫ | SECONDARY CONTAINMENT |
| | EMPLOYEE PARKING AREA |
| | EASEMENTS |
| | COUNTY GIS PARCELS |

**Site Plan**
Upper Yard
SRN 09301

**Kernen Construction**
Stormwater Management BMPs
Glendale, California

April 2017

Figure 2

**INSTALL FILTREXX SOXX ON DOWN GRADIENT HALF OF STOCKPILES (FROM SEP. 15 THROUGH MAY 15 EACH SEASON) PER I.2.(g) (TYP.)**

**ADD METAL SOXX TO EXISTING FILTREXX SOXX PER I.2.(f)**

**DRAINAGE INLETS TO BE COVERED**

**CONNECT TO SANITARY SEWER**

**ADD METAL SOXX TO EXISTING FILTREXX PER I.2.(f)**

**INSTALL BERM PER I.2.(b)**

**INSTALL PIPE SOCK PER I.2.(f) OF CONSENT DECREE**

**INSTALL 4-INCH SPEED BUMP BERM PER I.2.(c)**

**SECONDARY CONTAINMENT PER I.2.(j) (TYP.)**

**SPILL KIT PER I.2.(k) (TYP.)**

**INSTALL BERM PER I.2.(b)**

**ADD METAL SOXX TO EXISTING FILTREXX SOXX PER I.2.(f)**

PHOTO SOURCE: KERNEN, 3/17/2017

LOWER YARD
(SEE FIGURE 3)

NOISY CREEK

SWN
Consulting Engineers
& Geologists, Inc.

Fig2-SitePlanUpperYard

1" = 100'±

0    100
FEET

LISCOM HILL RD.
GLENDALE DR.
NCRA



Figure 3

EXPLANATION

— SITE BOUNDARIES
- - - DRAINAGE AREAS
- - - DRAINAGE DIRECTION
✦ SAMPLE LOCATION / DISCHARGE POINT
- · - · ROADS
ACTIVE PILES
CREEKS
PROPOSED BMP
EXISTING BMP
EASEMENTS
COUNTY GIS PARCELS

PHOTO SOURCE: KERNEN, 3/17/2017

N

1"=200'±
0        200
FEET

GLENDALE DR.

UPPER YARD
(SEE FIGURE 2)

EQUIPMENT
STORAGE

AGG.

TENANT
AREA

SAND

DIRT

INSTALL FILTREXX
SOXX PER I.2.(o)

NOISY
CREEK

NORA

SAND

TENANT
AREA

ASPHALT
GRINDINGS

HALL
CREEK

CHECK DAM
(TYP.)

INSTALL FILTREXX SOXX ON
DOWN GRADIENT HALF OF STOCKPILES
(FROM SEP. 15 THROUGH MAY 15 EACH SEASON)
PER I.2.(g) (TYP.)

SLTOP

SLH
Consulting Engineers
& Geologists, Inc.

April 2017        Fig3-SitePlanLowerYard

Kernen Construction
Stormwater Management BMPs
Glendale, California

Site Plan
Lower Yard
SRN 08681

\\ARCA\SAN\Projects\2016\016181A-Kernen-SWRP\E5\PROJ_MXD\Fig3-SitePlanLowerYard.mxd/1/2017



EXPLANATION

— SITE BOUNDARIES
☐ BUILDINGS
✦ SAMPLE LOCATION /
   DISCHARGE POINT
☐ ACTIVE PILES
∙∙∙ CREEKS
— ROADS
— EXISTING BMP
— PROPOSED BMP
- - - DRAINAGE AREAS
— EASEMENTS
☐ COUNTY GIS PARCELS

N

1" = 300' ±

0            300

FEET

PHOTO SOURCE: GOOGLE, 5/26/2016

April 2017

SCW
Consulting Engineers
& Geologists, Inc.

Kernen Construction
Stormwater Management BMP's
Glendale, California

Fig3:SiteOverview

Site Plan
Overview
SRN 09031

Figure 1

GLENDALE DR.

HALL CREEK

NCRA

516-151-017

516-151-016

516-151-007

LOWER YARD
(SEE FIGURE 3)

NOISY CREEK

SL/DP

516-141-003

516-141-005

516-141-017

UPPER YARD
(SEE FIGURE 2)

AREA 4

AREA 3

AREA 2

AREA 1.a

AREA 1.a

AREA 1.b

SL

SL/DP

SL/DP

DP

SL